## TURNIPSEED v. SIRRINE.

1. ATTORNEY'S FEES—EXECUTOR—WITNESS FEES—PRINTING—TRAVELING EXPENSES.—It is the duty of an executor to defend a suit brought by a party claiming the property passing under the will, under an agreement to make mutual wills, and it is better for him to get the sanction of the Court as to attorney's fees; but where he loses, and that is not done, the Court will permit him to pay out of the trust estate reasonable fees to attorneys representing him in the fight, traveling expenses of his attorneys, necessary printing, witness fees, &c. *Wham* v. *Love, Rice Eq., 51, distinguished from this.*

2. EXECUTOR—ACCOUNTING—WILL.—Executor has no right to pay verbal legacy made by testator, after execution of· will and not in accordance therewith.

3. IBID.—IBID.—INTEREST—DISCRETION.—Charging interest against trustee is within discretion of Court, and under circumstances here no annual balances are struck, and less than seven per cent. is charged.

4. IBID.—IBID.—Executor is not allowed to make profit out of trust estate by investing in stocks, but he is allowed to reimburse himself moneys of his own ·put into the trade with the trust fund.

5. IBID.—IBID.—Executor cannot pay himself legacy of so much money in lieu of commissions and fees by transferring to himself stocks at less than true value.

6. IBID.—IBID.—COMMISSIONS.—Executor is entitled to five per cent. commissions for collecting and paying out cash, and for receiving and turning over to legatees stocks and bonds as so much money, but no commissions for receiving and turning over stocks, bonds and notes as such.

7. IBID.—IBID.—INSURANCE.—Where furniture is turned over by executor to legatee before action and decree that it belongs to another, he is not required to account for rent of furniture, but must account for insurance money collected on policy covering this and other furniture.

Before BUCHANAN, J., Greenville, August, 1900. Modified.

Accounting by executor in Susan E. Turnipseed against Geo. W. Sirrine, executor. From Circuit decree the executor appeals.

*Mr. W. G. Sirrine,* for appellant, cites: *Court may provide compensation for executor:* 10 N. J. Eq., 332. *As to commissions to executors:* 58 S. C., 22.

*Mr. Jos. A. McCullough,* for appellant, cites: *Expenses of litigation should have been allowed:* 1 N. & McC., 326; 2 McC. Ch., 73; 2 Hill Ch., 113; Rice Eq., 51; 1 Strob. Eq., 394; 4 Rich. Eq., 41; 8 Rich. Eq., 87; 10 Rich. Eq., 202; 12 Rich. Eq., 229; 22 S. C., 412; 24 S. C., 580; 36 S. C., 92; 58 S. C., 298; Bail. Eq., 159.

*Messrs Ansel, Cothran & Cothran,* for appellant, cite: *Executor should be allowed his counsel fees:* 12 Rich. Eq., 229; 8 Rich. Eq., 89; 10 Rich. Eq., 202; 4 Rich. Eq., 44; 36 S. C., 92; 2 McC. Ch., 76; 2 Hill Ch., 121; 1 Hill Ch., 411; 4 Ency. 434.

*Messrs. George Johnstone* and *Haynsworth & Parker,* contra. The latter cite: *Executor should not take part in litigation between claimants of surplus of an estate, and expenses of litigation so engaged in by him should not be allowed:* Rice Eq., 51; 4 Rich. Eq., 39; 73 Cal., 281; 48 S. C., 86. *Gratuitous payments to Miss Lewis and others should not be allowed:* 2 DeS., 279. *Executor is entitled to no commissions for delivering legacies in specie:* 4 DeS., 529; 58 S. C., 117. *Insurance money collected by trustee on trust property enures to benefit of cestui que trust:* 50 S. C., 514.

April 9, 1901. The opinion of the Court was delivered by

MR. JUSTICE POPE. This is the same action reported in *57 S. C., 559,* which this Court, after reversing the judgment of the Circuit Court, remanded to that Court for such further proceedings as may be necessary to carry into effect

the views announced by this Court.    After the *remittitur*
reached the Circuit Court, that Court, by an order dated 21st
day of May, 1900, required George W. Sirrine, as executor
of the will of Mrs. A. Viola Neblett, deceased, to account
before the master for Greenville County, S. C., for all the
property and moneys of said estate, and directed the said
master to state the account of said executor as to all undis-
puted items, and to take the testimony on all controverted
matters, and report such testimony to the Court.    The
master had discharged his duty under said order.    The tes-
timony on all disputed matters accompanied his report.
These disputed matters came on to be heard before his
Honor, Judge Buchanan, who decreed thereon in favor of
the plaintiff.    Therefrom the executor, Mr. George W. Sir-
rine, appealed to this Court on twenty-five exceptions, as
follows:

"1.   The Circuit Judge erred in holding that the executor,
G. W. Sirrine, employed all the attorneys for the defense and
instructed them to represent the interests of all the defend-
ants; whereas, the evidence shows and he should have found,
that the executor employed Cothran, Wells, Ansel & Cothran,
W. B. Sirrine, C. F. Dill and J. A. McCullough to represent
the interests of the estate, to represent him as executor, and
there were no instructions to them to represent the interests
of all the defendants.

"2.   The Circuit Judge erred in holding that the executor
employed all the attorneys for the defense, and 'agreed to
pay them out of the estate; it was part of this agreement that
these attorneys should make no charge against the legatees
individually or against the executor individually.'    There
being no evidence to sustain said finding.

"3.   He erred in not holding that the said executor as such
had the right to employ, and did employ, Wm. B. Sirrine,
Esq., to represent him in the said action and to advise him as
executor; that the said attorney performed the services re-
quired of him; that the amount paid him therefor was

reasonable, and constituted a legitimate charge against the estate.

"4. He erred in not holding that the said executor as such had the right to employ, and did employ, C. F. Dill, Esq., to represent him in the said action and to advise him as executor; that the said attorney performed the services required of him, and that the amount paid him therefor was reasonable, and constituted a legitimate charge against the estate.

"5. He erred in not holding that the said executor as such had the right to employ, and did employ, the firm of Cothran, Wells, Ansel & Cothran to represent him in the said action and to advise him as executor; that the said attorneys performed the services required of them, and that the amount paid them therefor was reasonable, and constituted a legitimate charge against the estate.

"6. He erred in not holding that the said executor as such had the right to employ, and did employ, Jos. A. McCullough, Esq., to represent him in the said action and to advise him as executor; that the said attorney performed the services required of him, and that the amount paid him therefor was reasonable, and constituted a legitimate charge against the estate.

"7. The Circuit Judge erred in holding that the executor was only entitled to a credit of $200 for attorneys' fees. Whereas, he should have held that the amount reported by the executor for attorneys' fees, $1,950, was reasonable, was expended in the honest effort to defend his trusts and should be allowed.

"8. The Circuit Judge erred in holding that the expenses of litigation paid by the executor are not a proper disbursement; they were incurred in litigating questions between the plaintiff and the legatees, and cannot be allowed. Whereas, he should have held that such expenses were incurred in an honest effort to defend his trust, and should be allowed.

"9. The Circuit Judge erred in holding that 'these legatees were necessary parties to any proceedings seeking to impress a trust or lien upon the property.' The action being

for the specific performance of an alleged contract, could have proceeded to judgment against the executor alone.

"10. The Circuit Judge erred in holding that the executor was a necessary party simply and only for the reason that he was a party in interest and a stakeholder. Whereas, he should have held that the executor was a necessary party as representing the estate against which a claim under contract had been made, and that it was his duty to enforce the provisions of the will and defend any attack upon it.

"11. The Circuit Judge erred in holding that the real controversy was between the plaintiff and the legatees under the will. Whereas, he should have held that was between the plaintiff claiming under a contract and the executor representing the esate, whose duty it was to defend the will.

"12. The Circuit Judge erred in holding that the issue in the case was whether the legatees or the plaintiff should take precedence, and that with such issue the executor in his trust relations had no concern. Whereas, he should have held that the issue was whether the will should give way to the alleged contract, with which question the executor had in his trust relation all to do.

"13. The Circuit Judge erred in holding that the executor was entitled to be reimbursed only for such expenses as were necessary to preserve the fund so as to keep it subject to the final judgment of the Court. Whereas, he should have held that the executor was charged with the confidential duty and trust of carrying out the provisions of the will and to defend it from all attacks or claims inconsistent with its provisions, and should be reimbursed for expenses honestly incurred in furthering this object.

"14. The Circuit Judge erred in holding that the expenses incurred by the executor for which he seeks reimbursement were incurred not to preserve the fund, but to establish the interest of the rival claimants, and are not chargeable to the estate. Whereas, he should have found that said expenses were incurred in the honest effort to protect the trust confided to him, and were proper charges against the estate.

"15. The Circuit Judge erred in holding that the effort of the executor was clearly to throw the entire burden of this litigation upon the estate at all hazards, to the exemption of himself, his wife and the corporation of which he was head.

"16. His Honor erred in holding that the executor should not be allowed the expenses of printing, traveling and witness fees, when he should have held that the case being decided in his favor in the lower Court, it was his duty and right to pay such expenses and resist the appeal until its final determination by the Supreme Court.

"17. His Honor erred in holding that the executor paid out any fees in the defense of the interest of Mrs. S. E. Sirrine, when the testimony shows that the executor did not make such payment, and that her interests were represented solely by W. G. Sirrine.

"18. His Honor erred in holding that the executor paid out any sums to counsel for representing the Neblett Free Library Association, when all the testimony shows that the executor understood it to be his duty to employ counsel to defend the will, and that the defense in the case of the association was a mere matter of form, because there was no necessity for it to make a separate contest, the claim of the plaintiff being against the will under which it held, and not against the association.

"19. His Honor erred in holding that the executor should refund four payments of $100 each, made by him on May 28, 1897, when the evidence shows: (1) That these payments were made after the probate of the will, and more than a month after the death of the testatrix. (2) That they were made at the dying request of the testatrix. (3) That the plaintiff knew that these payments were to be made, and made no objection thereto. (4) That they were made by the executor under the impression that the will was valid, that no contest would be made, and he obtained the consent of the residuary legatee in writing. (5) That at least two of the $100 payments were claimed as just and valid debts, to wit: $100 by Miss Mary Lewis, and $100 by Miss Mattie

Lewis. (6) That three of the four parties who received the $100 were present nursing Mrs. Neblett when she died, and that the fourth was an old friend of Mrs. Neblett's in needy circumstances, and it would be inequitable and unjust that such payments be set aside. (7) The plaintiff has said in her testimony that she does not desire the money refunded, if the parties to whom payments were made are compelled to refund.

"20. His Honor erred in holding that the plaintiff is entitled to ten shares in the Piedmont Saving and Investment Company, which the executor took under the will for his fee at the appraised value of $105 per share, when he should have held that the executor is entitled to this stock for his services to the estate, and to the dividends which he has received on the same since he had the stock transferred to himself, and it was error in his Honor to hold that plaintiff was entitled to said dividends with interest thereon.

"21. His Honor erred in holding that the executor is not entitled to commissions on all personal property and choses in action, including stock and bonds, when he should have held that he should be allowed commissions on the value of all such property handled by him, and that such commissions should be credited to his account as executor.

"22. His Honor erred in holding that the executor is liable for money on deposit, which was kept in the bank to meet current expenses, when he should have held that he is liable to the estate for only such accumulation of the estate as accrued in his hands.

"23. His Honor erred in holding that the furniture turned over to Mrs. Sirrine should be subject to a rental value and that the value should be fifteen per cent. per annum, and that the executor is liable for $180 rent for the time such furniture was in possession of Mrs. Sirrine; when he should have held that such furniture was turned over to Mrs. Sirrine before the commencement of the suit, and had been carefully preserved by her and turned over to the plaintiff in as good

condition as when received, upon the result of the controversy being determined by the Supreme Court.

"24. His Honor erred in holding that the executor is liable for $150, one-half of the insurance collected by Mrs. Sirrine from the insurance company, after the fire, when it appears from the testimony that only a few articles of trifling value were damaged by the fire, and that such articles were restored to their previous condition and turned over to the plaintiff, and there is no evidence whatever of any damage to such furniture.

"25. His Honor erred in requiring executor to execute a deed to the plaintiff for the real estate owned by the testatrix at the time of her death, because the plaintiff alleged in the complaint that there was no real estate, and is estopped from claiming the same; but the executor is nevertheless willing to execute a deed to said real estate, if he be allowed the credits claimed by these exceptions."

It seems to me that the very first thing which is necessary to be done before beginning the consideration of these exceptions is to determine what is the decision of this Court in this cause, so that we may determine what was in the Court's mind when it ordered the case back, "for such further proceedings as may be necessary to carry into effect the views herein announced." Judge Klugh, whose decree was considered by this Court, had found all questions of fact in favor of the plaintiff, Mrs. S. E. Turnipseed; but owing to the difficulty in his mind as to the agreement of Mrs. S. E. Turnipseed and Mrs. A. Viola Neblett to make mutual wills in favor of each other respectively not being in writing, he found the Statute of Frauds an insuperable difficulty in granting the relief prayed for by the plaintiff against all the defendants—hence he dismissed the complaint. This Court, however, unanimously agreed in all the findings of fact made by the Circuit Judge, Judge Klugh, but they also unanimously agreed that the Circuit Judge was in error as to his construction of the Statute of Frauds as a barrier to plaintiff's relief. Justice Gary, in pronouncing the judgment of

the Court, held: "It is true, this Court cannot decree that a will shall be made" (that is, that Mrs. A. Viola Neblett's will, as claimed by the plaintiff, had been agreed upon between them); "but as was said in the case of *Fogle* v. *Church,* it can determine that the plaintiff is the equitable owner, and entitled to be clothed with the legal title to all the property which she would have received if the will had been made, and it is so adjudged." Now, when this Court ordered this case to be remanded to the Circuit Court, it was that this view should be enforced by that Court. Now, what property was there to which Mrs. Turnipseed was thus found to have the equitable title, and to which she was thus adjudged to have the legal title? Why, the whole estate of Mrs. Viola Neblett owned by her at death, and which was still in the possession of the executor, and also the household and kitchen furniture of Mrs. A. Viola Neblett owned at her death, which had been turned over by George W. Sirrine, as executor, in May, 1897, just after testator's death, to his wife, Mrs. Sarah E. Sirrine, and except so much as was necessary to pay the debts of the said A. Viola Neblett.

The first question we will consider is presented by those exceptions which relate to retaining counsel and appropriating $1,950 of the estate of Mrs. A. Viola Neblett to the payment of such counsel. The executor obtained no order for the employment of counsel, nor did he obtain an order to pay them fees. As was remarked by the Court, in the case of *Ashley* v. *Holman,* 44 S. C., 166, the cases are quite different, when a trustee of his own motion commences an action concerning the estate of his *cestui que trust* without first obtaining an order of Court sanctioning such action, and the case of a trustee who is sued by a third party. In the latter instance, this Court said: "The rule is quite different when a trust estate is attacked by third parties. Of course, in such instances the principle of self-defense, of necessity, drives the trustee to Court and to the expenditure of the fund of the *cestui que trust.* It is not a case *of may* but *must.*" In the latter

cases, Courts will examine such expenditures with great care, to see that such expenditures by the trustee was just and proper, bottomed, of course, upon the character of the issues involved, and the services actually rendered by such counsel who may be employed.   In all such cases it would be better and safer for such trustee, who is usually a layman, to obtain the direction of the Court sanctioning such fees before they are actually paid; but in those instances when the trustee goes forward under his own judgment and employs and actually pays his counsel such fees as they mutually agree upon, the Court will view the action of the trustee as to the counsel employed by him and paid by him, just and proper, if the same rules are employed by such trustee towards his counsel as would be adopted by the Court in determining counsel fees, which it would be proper to allow if its sanction and direction should be obtained before such counsel fees had been paid.   The Court will scrutinize with great care the circumstances surrounding each particular case to determine: *first,* the good faith of the trustee in his conduct as to the employment of such counsel; *second,* that such counsel so employed actually rendered the services in behalf of the trust estate; and *third,* that the fees paid was reasonably worth the sums paid by the trustee.   In the cause at bar, when Mrs. A. Viola Neblett died, her estate was left in an admirably compact shape.   There was no debts which would give the executor, George W. Sirrine, any trouble in their payment.   With the money on hand at the death of the testatrix, and the interest on her investments, every debt could have been paid at the expiration of the twelve months allowed the executor in which to ascertain and discharge the debts of his testatrix.   So that counsel, so far as the record here shows, were not consulted by the executor as to the payment of debts.   But the exigency which necessitated the employment of counsel arose from a different cause; it was when Mrs. S. E. Turnipseed exhibited her complaint, wherein she sought to have all the property of the testatrix, except so much as was necessary to pay the debts, burial

expenses and those of the last illness of Mrs. A. Viola Neblett; and also the bequests to Miss Doolittle; to the Woman's Christian Temperance Union Association; to the Woman's Suffrage Association; to Mrs. Maria Tucker; to the Providence Hospital; to Lindsay Moore, colored; to Mrs. Ida Evans Eve. Mrs. Turnipseed thus sought to nullify such provisions in the will of Mrs. Neblett as gave legacies to George W. Sirrine, Mrs. Sarah E. Sirrine, and the Neblett Free Library Association—the latter of which covered the bulk of the estate of Mrs. Neblett—that the executor, George W. Sirrine, found himself confronted with a suit of such magnitude and involving so many intricate points in law and equity, it was impossible for him, a layman, to know what to do and how to do it. He still held all the property as executor, except the articles bequeated to Mrs. Sarah E. Sirrine. His presence as executor, as defendant, in such action brought by Mrs. Turnipseed was absolutely necessary. Here was presented, as was pointed out in *Ashley* v. *Holman, supra,* the necessity for self-defense. The testimony shows that under such difficulties, the executor called upon, as his counsel, his son, W. G. Sirrine, Esq., a young lawyer of promise; the firm of Cothran, Wells, Ansel & Cothran, composed of such veterans at the bar as Judge James S. Cothran, George G. Wells, M. F. Ansel and Thomas P. Cothran, and also, it seems, of C. F. Dill, Esq. When Judge Cothran and Mr. Wells died, the executor added to such counsel Joseph A. McCullough, Esq. The plaintiff was represented by such lawyers as George Johnston, Esq., H. J. Haynesworth, Esq., and Lewis W. Parker, Esq. The Court will take judicial notice of the character as lawyers of the counsel selected on each side to this controversy. To the counsel named, the executor had paid before the decision was announced by the Supreme Court in this case as follows: to W. G. Sirrine, $250; to Cothran, Wells, Ansel & Cothran, $475; to J. A. McCullough, $125; to C. F. Dill, $75; and after the decisions were announced, to W. G. Sirrine, $205; to Ansel & Cothran, $410; to J. A. McCullough, $205; and to C. F.

Dill, $205; aggregating $1,950, of which $1,025 was paid after the decision of·the Supreme Court. The Circut Judge held that of this sum, $200 alone should have been paid, and that, therefore, the executor should make good to the estate in his accounts as executor the sum of $1,750, upon the ground that the litigation was conducted by said executor, through his said counsel, for the benefit of himself, his wife and the Neblett Free Library—thus taking sides with his co-defendants, while he as executor was a mere stakeholder. In reaching this conclusion great reliance was had upon the case of *Wham* v. *Love, as adm., et al.,* Rice's Eq. Report, 51, where this Court held: "An administrator is entitled to all expenditures made by him for the preservation and benefit of the estate in his hands, as for expenses incurred in resisting a questionable claim set up against the intestate, or other demand of like character tending to reduce the value of the estate, and diminish the interests of the distributees. So for fees paid in the course of administration to the ordinary or other officers; so, also, for fees paid for general advice as to the most proper and profitable course of administration. But costs and fees incurred by the administration in resisting the claims of the distributees can never be allowed as a suitable charge on the estate." Let us examine the facts of this last cited case. Mrs. Elmore J. Grier, of York District, had died *intestate* and all of her debts had been paid. Wham *et al.,* who were the plaintiffs, claimed to be grand-children of the *intestate* and her sole distributees, while the defendants, who were nieces and nephews of said *intestate,* denied that plaintiffs were the grand-children of said *intestate* or her distributees. Love, the administrator, was of nephews, and co-operated vigorously with the other nieces and nephews of *the intestate.* The plaintiffs succeeded, in a hard fought contest, in establishing that they were the grand-children and only distributees of Mrs. Grier, the intestate. ·Love, the administrator, paid all the counsel fees for defendants, and sought to charge the same in his accounts as administrator. The

Court denied his right so to do. The bond of such officer requires that he shall first pay the debts, &c., "and all the rest of the said goods, chattels and credits which shall be found remaining upon the account of the said administrator, the same first being allowed by the said Court, shall deliver and pay unto such persons respectively as are entitled to the same by law." The persons who are so entitled to have property delivered and money paid by an administrator, are called distributees, and grand-children of an *intestate* take such estate of the *intestate* in preference to nieces and nephews of such *intestate*. Hence Love, as the administrator, was seeking to have the counsel fees of those persons who claimed to be distributees, and who were adjudged not to be said distributees, paid out of the estate of the plaintiffs, who had been adjudged to be the sole distributees of the estate of his *intestate,* in his hands as administrator. The Court properly refused to allow any such payments. On the other hand, let us examine and see what is the condition under which the defendant executor found himself. By his oath of office, he had agreed that Mrs. A. Viola Neblett's last will and testament he had offered for proof in common form in the probate court of Greenville, S. C., was her last will and testament, so far as he knew or believed, and that he would well and truly execute the same by first paying the debts and then the legacies contained in the will. Therefore, by his oath of office, he had bound himself to pay the *legacies named in the will.* Those legacies covered the whole estate of his testatrix. When Mrs. Turnipseed set out in her complaint that, except as to Miss Doolittle, the testatrix had solemnly contracted with her, Mrs. Turnipseed, that all the personal estate of said Mrs. A. Viola Neblett should at her death pass in fee simple to her, Mrs. Turnipseed, the said executor was confronted by an alleged contract of his testatrix, virtually disposing of the very property he had sworn he would execute, and also which property, with a single exception, was still in his hands as executor. Under these circumstances, it was "no choice of sides" the executor

made.   He was bound by his oath to maintain the will.  The plaintiff had appealed to the law, and required him to be present.   It was no legal concern of the executor that the plaintiff had brought before the Court the Neblett Free Library Association; he simply accepted the gage of battle as tended by the plaintiff herself.   And herein lies the distinction between the cause at bar and that of *Wham and others,* v. *Love, as adm., et al., supra*—for this executor was dealing with a *contract* of his testatrix, as plaintiff alleged. He was bound to assume that his testatrix had made no such contract.   The Circuit Court held that the said contract was made, but in law or equity was not enforcible.   So when an appeal was taken, he was bound by his duty as executor to meet the plaintiff in the Supreme Court, and in order to do these things, he was compelled to employ counsel learned in the law to represent him as executor in both the Circuit and Supreme Courts.   What counsel did he employ? We have heretofore stated the counsel employed.   We are satisfied as to the fact of his having employed the counsel named.   But before we can sanction the fees paid to counsel, we must be satisfied that they rendered the services alleged for the benefit of the estate.   Did they so render those services?   We are satisfied from the testimony that William G. Sirrine, Judge J. S. Cothran, George G. Wells, M. F. Ansel, Thomas P. Cothran and Joseph A. McCullough did render such services as are referred to in the testimony offered before the master, but candor compels us to say that C. F. Dill, Esq., according to that testimony, did not return the services for which he has charged the executor, and for which the executor has paid him $280.   C. F. Dill's name does not appear among the attorneys who signed the answer of defendant, George W. Sirrine, executor; it does appear, however, to the *answer of the Neblett Free Library.* By the testimony, he examined one or two witnesses in the Circuit Court, at the trial of the issue, but made no argument there.   He made no argument in the Supreme Court.   He attended a few conferences between the defendants' attorneys.

He received a fee from the Neblett Free Library Associa-
tion, and was the only attorney, according to the testimony,
who did receive a fee from such Neblett Free Library Asso-
ciation in this cause. He has been absent from the State for
several years. There is no testimony giving any informa-
tion that he rendered any valuable service to the defendant,
Sirrine, as an attorney. We are obliged to hold that Mr.
Dill's claim, or rather the executor's claim, that Dill ren-
dered services to the estate of his testatrix as an attorney, is
not sustained by the testimony. The next phase of the
question is, has the executor paid proper fees to W. G. Sir-
rine, Cothran, Wells, Ansel & Cothran, and to their suc-
cessor, Joseph A. McCullough? Under the testimony, in
view of their services to the executor, Mr. G. W. Sirrine, we
hold that the payments made by him to them are valid
vouchers for the money paid to such gentlemen as their
counsel fees. We hold that the executor has failed to estab-
lish that the payments made to Mr. C. F. Dill are proper
credits in his account as executor. Therefore, the executor
must have his account corrected in this particular. All the
exceptions relating to this holding of the Circuit Judge are
sustained, except so far as Mr. C. F. Dill is concerned. The
next question is, should the executor have credit in his ac-
count as such executor for the payments made for the travel-
ing expenses of his attorneys, for printing briefs, for ex-
penses as to his witnesses, as they appear in his said account?
I think what has been held as to the first group of exceptions
must sustain the exceptions of defendant as to the conclu-
sion of the Circuit Judge as to these matters. I believe the
amount is only about $172.26. This sum is reasonable and
just, in the light of the testimony. Hence I hold the execu-
tor is entitled to credit for these matters, and the exceptions
relating thereto are sustained.

I will next consider the exceptions relating to the $400
paid to the Misses Lewis, Mrs. F. A. Walton and Francis
Whitmire, at the request of the testatrix on her death-bed,
but not provided for in her last will and testament. This is

directly in the face of the law.    The executor should not have made these payments and, of course, he is not entitled to any credit therefor in his accounts. In *Kerr* v. *Butler*, 2 DeS. Eq., 279, the Court said: "In considering the points of this case submitted to the Court by the report of the master, the first is that of three several sums of money paid by Elizabeth Hill at the request of her husband on his death-bed, after the making of his will, although it has been clearly proved such request was made by the testator and the moneys accordingly paid by his executrix, yet as the payments were not authorized by the will, the Court can not allow the same in the accounts of administration.    If the Court were to do so, it would, as to these sums, be a repeal or alteration of the will, directly contrary to the act of the Assembly on that subject, passed in the year of our Lord 1789 * * *"

I will next consider those exceptions relating to certain moneys which the executor had first charged in his account as the interest he had received from the Piedmont Savings and Investment Co. accruing upon certain funds of his testatrix that he had deposited in said Piedmont &c Co.    The amount is $272.87.    The plaintiff contends that the true method of stating the accounts of the executor is that he should be charged interest on his annual balances in his hands.    The interest then to be seven per cent. per annum.    I infer less than seven per cent. was paid on deposits.    It is true that the accepted rule is that in adjusting the accounts of fiduciaries, annual balances must be struck and interest charged on such balances at the legal rate of seven per cent. per annum, but this is not an inexorable rule; there are instances where the Court of Equity declines to apply such rule.    As was stated by Mr. Justice Gary, in the case of *Nicholson, as admr.,* v. *Whitlock et al.,* 57 S. C., at page 42: "The case of *Pettus* v. *Clawson* (4 Rich. Eq., 95,) also shows that the principle is well established, that it is a matter of discretion with the Court, in its exercise of its equitable jurisdiction, whether it will allow interest against

the administrator. The rule laid down for the conduct of trustees in dealing with the trust estate, is thus stated in *Dixon* v. *Hunter,* 2 Hill, 304: "The general rule, as laid down in all the cases in reference to the accountability of trustees, is that they shall use such diligence in the preservation and in the improvement of the trust fund as a prudent man would do in the relation to his own affairs. The coralaries to this proposition are: 1st. That he shall not make profit out of his trust; and, 2d. That he shall be charged with no loss, except for neglect of duty. . All rules on the accountability of trustees must be made in subordination to these principles, and whenever a case occurs in which the application of a general rule violates these principles, the case should constitute an exception to the rule, and be decided with reference to the great principles which I have just stated.' " Now let us apply those principles to the case in hand. Mrs. Neblett died on the 29th April, 1897. The present action was begun on the 6th July, 1897, seeking the recovery of her estate from the executor and his wife, An injunction was granted by Judge Watts, restraining the executor with any execution of the provisions of the will. The executor had a right to suppose that any loan of the estate so as to recover seven or eight per cent. interest thereon, would meet with sharp criticism. It is not usual for national banks to pay interest on deposits, yet the executor felt that it was not his duty to have funds in his hands lie entirely idle and unproductive. He had a right to suppose that the cause might be ended within the twelve months next ensuing after his testatrix's death and the proof of her will on 12th May, 1897, when he would be required to turn over the estate, as the Court might order the fund paid into the Court. Hence he placed it in this investment company at a lower rate of interest than seven per cent., but with his power to collect from such investment company the funds on deposit in it, virtually, on call. This being the circumstances surrounding this executor, I think his case falls under the exception, and that he should only be required to account for the inter-

est he actually collected from these deposits, and to this extent I think the Circuit Judge was in error in holding him to the usual rule; but I wish it distinctly understood that I confine this ruling to apply to the funds which yielded this $272.87 as interest.

I will next consider those exceptions relating to the shares of stock to which the estate of Mrs. A. Viola Neblett became entitled to subscribe for in the increase of stock made by the F. W. Poe Manufacturing Company, because of the estate holding five shares in said manufacturing company.

4  The executor notified the manufacturing company that he would take for the estate the five shares of stock therein in its increase of stock. This increase of stock was in considerable demand, and no less than five per cent. was bid for the privilege from the beginning, and running up as high as twelve per cent. Mr. Sirrine (the executor) finally determined to take the five shares additional in his own right and advance $100 from his own funds as part payment thereof. Clearly he had no right to make a profit to himself in any such way. No trustee can be allowed to make a profit out of his trust. He, therefore, must surrender these shares to Mrs. Turnipseed, with all dividends earned on such stock, but he must have credit on his accounts for the $100 which he paid thereon from his own funds as of the date he paid said $100.

I will next examine the exceptions relating to the ten shares in the Piedmont Investment Company, which he, G. W. Sirrine, soon after he assumed his office as executor, had transferred to himself, in his individual capacity. I think he claims that he did this in May, 1897, and that he intended this in payment of his legacy of $1,000 to him as an individual, under the fifteenth clause of the will of Mrs. A. Viola Neblett. This stock stood in the name of his testatrix at her death. It was appraised, as required by the will, by himself, Mr. Hamilton Beattie and Mr. W. E. Beattie. It was appraised by all three of them at $105 for every $100 share. He did not charge himself

19—60

with the $50 in excess of the $1,000, its face value. In fact, he only charged himself with $1,000. By the will of Mrs. Neblett, he was not authorized to take $1,000 in her bonds and stocks. If he had done so, he would have been obliged to charge himself with $1,050, for the testatrix in every case, when she desired a legacy to be taken in stocks or bonds, expressly said so, and in addition provided that such stocks should be paid over on legacies *at their appraised value;* 12th May, 1898, when all legacies became payable under the law, this stock was rated at $112 for every $100 of par value. This is but another illustration of the wisdom of the law in forbidding trustees purchasing from their trust estates. It cannot for a moment stand. The executor must turn over this stock, with all other dividends earned thereon, to the plaintiff. See *Dixon* v. *Hunter, supra.* Of course, if this sum of $1,000 appears in his returns, it must be expunged, for I hold this transaction should be rooted up.

It will be just as well at this point to consider the legacy to defendant of $1,000. The fifteenth clause of the will of Mrs. Neblett reads as follows: "Fifteenth. I give and bequeath unto my said executor $1,000, to be paid out of my estate first after my said just debts and funeral expenses are paid as aforesaid, that said $1,000 is to be paid to the exclusion of all other legacies set out in this my last will and testament, if said exclusion be necessary, which is to be in lieu of all fees due him for his services in managing and carrying out the provisions of this my last will and testament." As I announced early in this opinion, the decision of this case by the Supreme Court decided that all legacies except those consented to by the plaintiff were null and void. This is a legacy. It may be said that, because it is therein provided that such legacy shall be accepted in lieu of all fees due to the executor, it may be allowed to operate. Suppose it had been $5,000 or $10,000, with the same condition annexed, would that not be a palpable evasion of the plaintiff's right to the ownership of the whole estate, after the payment of the legacies to Miss Doolittle

and others to which Mrs. Turnipseed assented? I feel that it would be as well to announce now the conclusion to which I have been led by the facts in this case in relation to the compensation or fees to be allowed to this executor in making up his accounts. It strikes me that this will meet the equities : Let the executor receive his legal commissions (2 1-2 per cent.) for receiving all moneys, including the appraised value of the stocks and bonds turned over by the executor to Miss Doolittle, to Mrs. Emma Maria Tucker, to the Providence Hospital, to the National Woman's Christian Union, to the National American Woman's Suffrage Association and to Lindsay Moore, colored, and the like legal commission (2 1-2) per cent. for paying out all the cash entered in his accounts, as well as the assessed value of the stocks and bonds used in paying out, or over, to the legatees I have just named. I take this position as to the stocks and bonds just mentioned because the legacies to those parties *were for so much money,* and it was only stipulated that the said amounts of money should be paid by transferring her stocks or bonds. The executor is entitled to his legal commission for paying over any moneys to the plaintiff, but not for turning over to her the stocks and bonds and notes. The statute expressly provides the commissions to executors for paying over and receiving moneys; it provides no fees or compensation to executors for turning over specific *choses in action,* or a specific piece of property to a legatee. For instance, a testator leaves by his will, his horse, "Gray Eagle," to his son John, no commission is due to his executor for turning over such horse to the legatee; if, however, he had been directed by his testator to sell "Gray Eagle" and turn over the purchase money to his son, then commissions would be earned by the executor, under the statute. So, also, a tract of land, "Black Friars," is provided for testator's son John by the will of his father, no charge can be made therefor by his executor. In the cause at bar, the Court has decreed that all the personal property be turned over to Mrs. Turnipseed, as the legal owner, as

such estate is left by Mrs. Neblett in stocks and bonds and notes, which by the terms of the will were to be listed and appraised, and these choses in action as left by the testatrix have been turned over, why, of course, the executor can claim no commissions for turning them over to Mrs. Turnipseed. They are not turned over to her as so much money, but as so many bonds, notes or stocks, whether good or bad. I have thus hastily given my views on these points, and regret the necessity which prevents a fuller elaboration of them.

The next question is, what compensation shall be paid to Mrs. Turnipseed for the injury to the furniture, which was turned over to his wife by the executor immediately after Mrs. Neblett's death? It is in testimony that Mrs. Sirrine insured her own furniture and, also, that she had received from the estate of Mrs. Neblett, against loss by fire. A fire injured both classes of furniture, but did not totally destroy it. Mr. Sirrine collected $300 on the adjusted loss to such furniture by the fire. Mr. Sirrine, the executor, testified that the furniture insured was about half and half—that is, half was owned by Mrs. Neblett and half by Mrs. Sirrine, in the matter of the ownership. The plaintiff insists upon one-half of the adjusted loss. The Circuit Judge held that to be fair, and ordered $150 paid to Mrs. Turnipseed. This is objected to by the defendant, the executor. It will not do to say that Mrs. Neblett's furniture was not injured, in view of the fact that Mr. Sirrine, the executor, testified that he had renovated such furniture himself after the fire, and that the cost of such repairs was over $25. In view of the fact that the executor anticipated the law in turning over to his wife this specific legacy, he must answer for all the damage thereafter, to wit: the $150 collected from the fire insurance company. But inasmuch as the executor would have had to pay for the storing of the furniture, and there is no proof that the furniture suffered any damage while in Mrs. Sirrine's care, except from the fire, I have already considered, I do not think the charge for the

use should be sustained, and the Circuit Judge must be over-ruled on that point.   Let only $150 be collected from the executor therefor, and this is to include the small quantity destroyed by the fire, for I consider that loss covered by the amount paid by the insurance company.   It follows that the decree of Judge Buchanan must be modified as herein required.

It is the judgment of this Court, that the judgment of the Circuit Court be modified as herein required, and that the case be remanded for such further proceedings as herein may be rendered necessary.