18287

*In re* ESTATE of William L. OUZTS, Wilmot B. Ouzts, as Administrator d. b. n. c. t. a. of the Estate of William L. Ouzts, Petitioner-Respondent, Tallulah C. Ouzts and Dorothy Ouzts Williams, as Executrices of the Estate of David T. Ouzts, Appellants.

(139 S. E. (2d) 465)

*Messrs. Kerr, Smith & Barnes,* of Spartanburg, *for Appellants,*

*Messrs. Means, Evins & Browne,* of Spartanburg, *for Respondent,*

December 17, 1964.

Moss, Justice.

William L. Ouzts, a resident of Spartanburg County, died testate on February 8, 1960, and by the terms of his will he appointed his brother, David T. Ouzts, as executor. This brother qualified as such and continued to serve in such capacity until his death on March 18, 1961. Thereafter, the respondent herein, Wilmot B. Ouzts, was appointed Administrator *de bonis non cum testamento annexo* of the estate of

William L. Ouzts. David T. Ouzts died testate and by the terms of his will he appointed the appellants herein, Tallulah C. Ouzts and Dorothy Ouzts Willliams as executrices of his will. They duly qualified and are now serving as such.

At the time of the death of William L. Ouzts, he owned various stocks held in "margin accounts" by and in the name of (1) Harris, Upham & Company, (2) James Richardson & Sons, (3) Pennington Colket & Company and (4) Carl Loeb Rhoades & Company, as brokers. These stocks were registered in the names of the aforesaid brokers under an agreement which governed the relationship of the parties with reference to the stocks held in these "margin accounts". Physical possession of these stock certificates were, at all times, retained by the brokers at their respective home offices located without the State of South Carolina. Dividends on the aforesaid stocks were received by the brokers and credited to the account of William L. Ouzts. During the lifetime of William L. Ouzts these stocks, though registered in the name of the aforesaid brokers, were voted by them under the express orders of William L. Ouzts. He instructed the brokers when and what stocks should be sold and they were sold at his direction. Upon the death of the testator, David T. Ouzts furnished to the brokers a certificate of his qualification as executor and all of the aforesaid stocks were sold prior to the death of David T. Ouzts, at his direction, and the proceeds of said sale, after the deduction of the indebtedness owed the brokers by William L. Ouzts, were remitted by said brokers to David T. Ouzts, as executor as aforesaid.

All of the said stocks in the "margin accounts" held by the four brokers above named, were duly appraised as a part of the estate of William L. Ouzts, and the value of said stocks was fixed by said appraisers on the basis of the market value as of the date of his death. These values so fixed were the values used by the executor in computing Federal and State Estate taxes. The appraised value of all the stocks in the "margin accounts" held by the four brokers aforesaid, amounted to $1,280,872.33, the total indebtedness against

the same aggregating $602,881.12, leaving a net of $677,-991.21, which said sum was remitted and received by David T. Ouzts, as executor as aforesaid.

After the death of David T. Ouzts, a controversy arose between the respondent and the appellants as to what commissions David T. Ouzts was entitled to receive as executor of the estate of his brother, with respect to the securities of the estate which were held by the various stockbrokers in the "margin accounts" and which were disposed of in the manner hereinbefore stated.

The appellants contend that the estate of David T. Ouzts is entitled to commissions on the basis of the market or appraised value of the stocks in the "margin accounts" undiminished by the indebtedness of the testator to the brokers. The respondent contends that the commissions to which the estate of David T. Ouzts is entitled should be based upon the equitable interest of the testator in the stocks held by the brokers and that such interest was the net amount of $677,-991.21, which said sum was received by David T. Ouzts, as executor as aforesaid.

The respondent filed his Petition in the Probate Court for Spartanburg County, asking for a determination that David T. Ouzts, as executor of the estate of William L. Ouzts, was only entitled to commissions on the balance of the sale of the proceeds of stocks held in the "margin accounts", after deduction of the indebtedness owed by William L. Ouzts, and not on the market or appraised aggregate value of all the stocks in the "margin accounts".

The Probate Judge of Spartanburg County, after taking testimony and hearing arguments, found that the appellants, as representatives of the estate of David T. Ouzts, were not entitled to commissions on the gross value of the stock pledged in the "margin accounts" of William L. Ouzts, and commissions should be computed only on the net amount, or balance of the sale proceeds after payment of the indebtedness owed on the "margin accounts", received by David T.

Ouzts, as executor. The executrices of the estate of David T. Ouzts appealed this holding to the Court of Common Pleas for Spartanburg County. The appeal came on for a hearing before the Honorable Bruce Littlejohn, Resident Judge of the Seventh Circuit, and, on February 21, 1964, he filed an order overruling the exceptions made by the appellants to the order of the Probate Judge and adopted such order as the judgment of the Court of Common Pleas. This appeal followed.

The question here is whether David T. Ouzts was entitled to commissions as executor of the estate of William L. Ouzts on the basis of the market or appraised value of his stock in the "margin accounts" with his brokers, or whether his commissions should be based only on the surplus remaining after the deduction of the indebtedness of the testator to the brokerage firms, which said surplus only was actually received, handled and distributed by the executor.

The right of an executor or administrator to compensation is controlled by Section 19-534 of the Code, which provides:

"Every executor or administrator shall for his care, trouble and attendance in the execution of his duties take, receive or retain in his hands a sum not exceeding the sum of two dollars and fifty cents for every hundred dollars appraised value of all personal assets which he shall receive and the sum of two dollars and fifty cents for every hundred dollars appraised value of all personal assets which he shall pay away in credits, debts, legacies or otherwise during the course and continuance of his management or administration and so in proportion for any sum less than one hundred dollars. * * *"

The aforesaid statute fixes the commissions of an executor by a percentage of the sums "which he shall receive" and "which he shall pay away" upon the appraised value of all the personal assets of the estate. The appellants and respondent assert that a proper construction of the aforesaid statute will sustain their respective legal positions.

The appellants call our attention to Section 9017 of the 1942 Code of Laws which provide commissions to an executor ònly for receiving and paying over moneys and provided no fees as compensation to an executor for receiving and turning over specific property to a legatee. Our Court so construed Section 9017 of the 1942 Code. *Turnipseed v. Sirrine,* 60 S. C. 272, 38 S. E. 423. However, the General Assembly, by an Act approved March 12, 1943, 43 Stats. 34, amended Section 9017 of the 1942 Code relating to commissions of executors and administrators by providing for the calculation of such commissions upon the "appraised value of all personal assets" of an estate, "which he shall receive" and "which he shall pay away in credits, debts, legacies or otherwise * * *." The effect of the 1943 amendment was to allow to an executor or an administrator commissions on estate assets received and distributed in kind, in addition to compensation for receiving and paying over moneys; such commissions being determined by a percentage of the appraised value of such personal assets. However, whether the assets of an estate be money, or other personal property, before an executor or an administrator is entitled to commissions, he must actually receive the money or other personal property, and pay away the money or distribute the personal assets in kind.

In the liquidation of stock margin accounts of William L. Ouzts, the stocks were actually sold by the brokers and only the surplus remaining after deduction of the indebtedness of Ouzts to the brokerage firms was actually received, handled or distributed by David T. Ouzts, as executor.

In the case of *Hitchcock v. Mosher,* 106 Mo. 578, 17 S. W. 638, the Supreme Court of Missouri has declared the law in that state to be that the administrator is entitled to commissions only on the assets belonging to his decedent actually received by him *virtute officii,* and properly paid away by him in the course of his administration. It appears in this case that the deceased had entered into contracts with stockbrokers for the purchase of certain stock, part of which was

sold by them and the proceeds credited to his account, leaving an unpaid balance. The stock was never delivered to the deceased or his administrator, but was sold by the brokers under the direction of the latter. Out of the proceeds of the sale a large sum was applied by the brokers on the unpaid balance of the debt of the deceased, and the remainder was accounted for and paid to the administrator, who charged himself with the full amount of the sale price and took credit for the sum appropriated by the brokers, claiming commissions thereon. It was held that the stock never became the property of the estate, that the only assets administered were the contracts, which did not produce the value on which commissions were claimed, but only so much as remained after payment of the balance to the brokers. The administrator was allowed commissions only upon the amount of such remainder. The Court, in this case, said:

"By charging himself with the gross amount of the sales of stock, and taking credit by the amount retained by Mathews & Whitaker (brokers), an appearance is given of having administered upon an estate of a value in excess of the estate actually administered upon, to the extent of that credit, but it is an apparition only. We think the circuit court did right in disallowing commission on a value which never had an existence for the beneficiaries of the estate or at all, save in the account of the administrator, where it appears for an instant on the debit, only to vanish in the same instant on the credit, side of that account. It is an estate too ghostly and impalpable to bear the burden of such commission."

*In re Mercantile Trust Co.,* 210 N. Y. 83, 103 N. E. 884, where the personal estate consisted principally of a large number of shares of stock which had been purchased by the decedent on a margin, were being carried by a broker, and never had been in the possession of the decedent, the administration was held entitled to commissions only on the number of shares turned over to it after the broker had been paid, and not on the proceeds of the stock applied to the payment of the indebtedness to the broker. The court said:

"For purposes of general definition, the relationship between customer and broker in relation to stocks which have been purchased, and are being carried by the latter on a margin, has been held to be that of pledgor and pledgee. * * * This relationship, however, has some special and unusual features. Ordinarily, and in the absence of evidence to the contrary, we assume this to be an ordinary case where a broker is carrying stocks on a margin for his customer, these stocks have not been delivered to him by his customer, but have been bought with his own money, and have never been in the possession of the latter. Under certain limitations the broker may hypothecate such stocks, and sell them for the payment of the indebtedness due thereon, and on payment by his customer is not restricted to the delivery of the specific certificates which he purchased on his order, but may deliver others of like kind. Not only has the customer not had possession of or delivered the stocks to the broker, but he cannot secure possession thereof from the broker until he has paid the indebtedness due thereon. Under such principles applicable to this case we think the conclusion that the respondent ever had possession of so much of the testator's stocks as were sold by the brokers for the purpose of paying their claim and discharging their lien, or that it 'received and paid out' the proceeds thereof, would result in an unwarranted subordination of facts to theory, and would be wholly unjustifiable."

The North Carolina Supreme Court has decided a question similar to the one presented by this appeal and under a statute of similar import to our Section 19-534. In the case of *In re Ledbetter,* 235 N. C. 642, 70 S. E. (2d) 667, an administrator applied for an allowance of commissions on the credits or offsets deducted from the indebtedness of his testate to certain brokers. In disallowing such commissions, the court held:

"The terms 'receipts' and 'expenditures,' as used in the statute, refer to the actual receipts and the actual expenditures of the personal representative. The administrator in the

instant case has no lawful claim to commissions on the credits or offsets deducted by the consent judgment from the indebtedness of his testate to the banks. This is necessarily so for the very simple reason that the deductions were neither actually received nor actually expended by the administrator. *Walton v. Avery,* 22 N. C. 405; 34 C. J. S., Executors and Administrators, § 865(b)."

In the case of *Buerhaus v. De Saussure,* 41 S. C. 457, 19 S. E. 926, 20 S. E. 64, the executors sold a lot of land for $16,000.00, the property being at the time encumbered with a mortgage of over $9,000.00. It was agreed that the purchaser would assume and satisfy the mortgage, which she did, and paid the balance of the purchase money amounting to over $6,000.00 to the executors. The executors claimed commissions upon the sales price of $16,000.00. The court held that they were only entitled to commissions on the purchase money in excess of the mortgage debt, saying: "This sum, therefore, was the only amount that passed through the hands of the executors, and upon that sum alone are the executors entitled to commissions."

In the case of *Spartanburg County v. Arthur,* 180 S. C. 81, 185 S. E. 486, the receivers of a defunct bank sought commissions upon collections received and handled by secured creditors of the bank. The statute under which they sought commissions established the measure thereof by the "moneys received" and by the "moneys paid out" by such receivers. This Court affirmed the circuit decree which said:

"Can it be said, with any show of reason, that moneys which admittedly were received wholly by a secured creditor and applied by such creditor to its indebtedness have ever been 'received' or 'paid out' by the receivers? For the court to hold that the fiduciaries in this instance 'received' the funds collected by the secured creditors is to disregard the indisputable physical fact, necessarily acknowledged by the receivers themselves, that such fiduciaries had never 'received' these collections. With even less color of reason can it be urged that the receivers ever 'paid out' such collections.

As a matter of fact, these collections were never 'paid out' by any one, but were merely credited by the secured creditors upon the debt."

It was pointed out in construing Section 9017 of the 1932 Code, now Section 19-534 of the 1962 Code, that our Court has steadfastly adhered to an exact definition of the word "received" and has denied unto a fiduciary any commissions upon a fund unless it could fairly be said that such fiduciary had himself actually "received" into his possession funds of the estate. In denying commissions to the receivers, the Court held that they were not entitled to such on collections made by the secured creditors and applied to their claims, especially in view of the construction of the word "received" in statute fixing fees of executors as meaning that money must be actually received and handled. Attention is called to the cases cited in *Spartanburg County v. Arthur,* 180 S. C. 81, 185 S. E. 486, construing what is now Section 19-534 of our Code, and holding that before an executor is entitled to commissions he must actually receive and pay out funds of an estate.

There is no valid basis here upon which to predicate an allowance of commissions to David T. Ouzts because he never actually received and paid out the funds upon which the appellants assert that he was entitled to commissions.

We conclude, as did the Probate Judge and the Circuit Judge, that the estate of David T. Ouzts was only entitled to executor's commissions on the surplus remaining after the deduction of the indebtedness of the testator to the brokerage firms, for said surplus only was actually received, handled and distributed by the executor.

The exceptions of the appellants are overruled and the judgment of the lower Court is affirmed.

Affirmed.

TAYLOR, C. J., and LEWIS, J., concur.

BRAILSFORD, J., concurs in result.

BUSSEY, J., dissents.

BRAILSFORD, Justice (concurs in result).

I concur in the majority opinion which, in my view, does not rest upon a strict construction of Section 19-534, Code of 1962, nor exclude from the basis for computing commissions all except personal property reduced to the actual physical possession of a personal representative. Here, under the terms of the agreements between the testator and the respective brokers, the executor never had title nor actual or constructive possession of the stocks on which commissions were disallowed, nor had he any right to control their disposition. The brokers were not obligated to hold specific certificates of stock for testator in his lifetime, nor, even, to retain in their possession and control certificates for a sufficient number of shares to cover his purchase orders. Upon testator's death, the respective brokers were authorized to liquidate the margin accounts by selling all stocks held for the testator, applying the proceeds to amounts properly due them and remitting the net balance to the executor. Under this state of facts, it may plausibly be put forward that the true assets of the estate were choses in action against the brokers, rather than specific shares of stock. In any event, these stocks were never received by the executor nor paid away by him within any permissible construction of the relevant statute. Therefore, the claimed commissions were properly denied.

BUSSEY, Justice (dissenting).

I respectfully dissent. Before proceeding to discuss the reasons why, I wish to call attention to certain factual matters not reflected in the majority opinion. According to the undisputed evidence, Mr. David T. Ouzts, in his capacity as executor, spent a great deal of time in the study and the giving of directions to the several brokers for the liquidation of the stock in the several margin accounts, and, in this re-

spect, acted in a most judicious manner to the best interest of the estate. It is further not disputed that the assets of the estate were quite sufficient to have enabled the executor to pay off the amounts due the several brokers on the margin accounts and to take actual physical possession of the stocks involved, had he been so minded or deemed it to the best interest of the estate to do so. Had he done so, it is most probable that this controversy would not be before the court.

Admittedly, both the rationale and the results of the majority opinion would have been quite correct prior to the act of the General Assembly approved March 12, 1943, 43 Statutes 34, which amended Section 9017 of the 1942 Code relating to the commissions of executors and administrators. The case of *Spartanburg County v. Arthur*, 180 S. C. 81, 185 S. E. 486, was decided in 1936, and all other decisions of this court relied upon as authority for the result reached in the majority opinion antedate the cited case.

The cases of *Hitchcock v. Mosher*, 106 Mo. 578, 17 S. W. 638; *In re Mercantile Trust Co.*, 210 N. Y. 83, 103 N. E. 884, and *In re Ledbetter*, 235 N. C. 642, 70 S. E. (2d) 667, cited and relied upon, are all, in my opinion, distinguishable from the case before us either on the facts or the statutory language involved or both. A leading case from another jurisdiction, which I think much more nearly, though not precisely, in point with the instant case is that of *York v. Maryland Trust Co.*, 150 Md. 354, 133 A. 128, 46 A. L. R. 231, wherein commissions were allowed the executor on the full value of the stocks held in margin accounts.

In my view, however, none of the above mentioned cases are at all decisive of the issues and contentions presented on this appeal. These issues and/or contentions arise strictly out of and involve a full consideration and construction of the above mentioned amendatory Act of 1943, the pertinent portion of which is set forth as follows:

"AN ACT to Amend Section 9017, Code of Laws of South Carolina, 1942, Relating to Commission of Executors and Administrators, by Providing for the Calculation of

Said Commission upon the Appraised Value of the Personal Assets.

"BE IT ENACTED by the General Assembly of the State of South Carolina:

"SECTION I: § 9017, 1942 Code, amended—calculate commissions of executors and administrators on appraised value of personality.—That Section 9017 of the Code of Laws of South Carolina, 1942, be, and the same is hereby amended, by inserting on line four of said section after the word 'dollars' and on line six of said section after the word 'dollars' the word 'appraised value of all personal assets'; so that said section, when so amended, shall read as follows:

" 'Section 9017. Every executor or administrator shall, for his, her or their care, trouble, and attendance, in the execution of their several duties, take, receive, or retain in his, her, or their hands, a sum not exceeding the sum of two dollars and fifty cents for every hundred dollars appraised value of all personal assets which he, she or they shall receive, and the sum of two dollars and fifty cents for every hundred dollars appraised value of all personal assets which he, she or they shall pay away, in credits, debts, legacies, or otherwise, during the course and continuance of their or either of their managements or administration, * *.' "

To bring the real contentions of the parties into proper perspective and focus, it is not contended by the respondent that the various stocks held in the several margin accounts were improperly included as assets of the estate in the inventory and appraisal thereof. Moreover, to my mind, the applicable statutory provisions of Title 19, Article 3, of the South Carolina Code, the inventory and appraisal forms prescribed by the South Carolina Tax Commission pursuant to the statutes, and the long established practice in the Probate Courts all indicate clearly that these stocks were properly included as assets of the estate in the inventory and appraisal thereof.

The basic contention of the respondent is simply that since decisions of this court prior to the adoption of the

1943 statute gave a strict construction to the word "receive" and held that money had to be actually received by an executor or administrator to be subject to commissions, and since the legislature presumably was aware of such decisions, it follows that when applied to other personal assets, the word "receive" has to be given the same strict construction, and, hence, since the executor here did not receive actual physical possession of the shares of stock, commissions on the appraised value thereof are not allowable.

On the other hand, the basic contention of the appellants is that when the amendatory act of 1943 is considered in its entirety, in the light of circumstances existing at the time of its passage, the legislature did not intend that the word "receive" should be given such a strict construction with respect to personal assets other than money; and that such personal assets, other than money, are received by an executor or administrator, within the legislative intent, when he receives constructive possession and control thereof with the attendant burdens and responsibilities.

I most respectfully submit that the majority opinion does not sufficiently reach or deal with the main thrust of appellants' argument here and rather summarily disposes thereof without full consideration. The entire argument of the appellants is disposed of by a holding that the only effect of the 1943 amendment was to merely allow an executor or administrator commissions on the appraised value of personal assets actually received and distributed in kind, in addition to commissions on money actually received and paid out, which latter commissions were allowed prior to the 1943 enactment.

To begin with a consideration of the act involved, it is elementary that all rules of statutory construction are servient to the one that the legislative intent must prevail if it can be reasonably discovered in the language used, which must be construed in the light of the intended purpose. *Greenville Enterprise, Inc. v. Jennings,* 210 S. C.163, 41 S. E. (2d) 868. It is further well settled that where there is doubt

as to the legislative intent, .the title of the act is a proper matter for consideration in determining the legislative intent, and this is particularly so where, as in this jurisdiction, the Constitution provides that every act must relate to one subject which shall be expressed in the title. In this connection see numerous cases in 17 West's South Carolina Digest, Statutes, Par. 211, p. 241.

The statute must be construed in the light of the evil which it seeks to remedy, and in the light obtaining at the time of its enactment. *Judson Mills v. South Carolina Unemployment Compensation Commission,* 204 S. C. 37, 28 S. E. (2d) 535; *Creech v. South Carolina Public Service Authority,* 200 S. C. 127, 20 S. E. (2d) 645.

With these principles in mind, just what was the intention of the legislature? Since the statute providing for executors' and administrators' commissions prior to the 1943 amendment referred only to "dollars" received and paid out as a basis for the calculation of commissions, this court consistently held, as already pointed out, that no commissions were allowable on assets other than money, and with respect to money, it is understandable that the court gave a very strict construction to the word "receive" since money usually either is actually received or is not received at all. Due to the ever increasing complexities of business life, and the infinite variety of assets which often comprised the assets of a decedent's estate, it necessarily followed that in many instances executors and administrators were charged with vast responsibilities even though there was little, if any, cash money coming into their hands, and, consequently, in many instances they could not be adequately compensated in the absence of bringing a suit against the estate in the court of common pleas for extra compensation Added to the foregoing facts, with the advent of World War II federal estate tax rates were greatly increased and exemptions greatly lowered with the result that many estates formerly unaffected by federal tax laws became involved with tax problems, greatly adding to the burden of executors

and administrators. It was clearly in the light of these conditions that the legislature adopted the 1943 amendment.

The legislature was no doubt aware of the prior decisions of this court, but it was also aware of the fact that money usually is actually received, if it is in any sense received. It, likewise, knew that with respect to personal assets, other than money, an executor or administrator in many instances, most probably more often than not, does not receive actual physical possession thereof. To the contrary, he receives constructive possession, the right of control and receives such assets to the extent that he is responsible for the proper handling thereof. To mention only a few simple ilustrations, a furniture or appliance merchant has a stock of goods in the store and not infrequently still many items in warehouses where they may or may not be subject to liens or other indebtedness. A farmer, for instance, dies leaving virtually no cash, but crops, farm equipment, livestock, etc. Seldom, if ever, does an executor or administrator take actual physical possession of such assets. He does, however, receive such assets to the extent that he has control thereof and is reponsible for the safekeeping and handling of the same. Even capital stocks, with which we are here concerned, are often times held for a decedent by banks and brokerage houses under various contractual arrangements other than margin accounts, and as often as not the executor who has the control of and responsibility for such stocks never receives the actual physical possession thereof.

 The title of the act certainly indicates an intention on the part of the legislature that commissions should be calculated on the basis of the appraised value of all personal assets, properly included in the inventory and appraisal, if such assets are in any sense received by the executor or administrator to the extent that he has the control thereof and the responsibility therefor.

When the entire act here involved is considered, including the title and all of the attendant circumstances presumably well known to the legislature, it appears to me that

the legislature intended that an executor need receive the personal assets of the estate, properly included in the appraisal thereof, only to the extent of being in control thereof and responsible for the proper handling thereof in order to entitle him to commissions thereupon. Certainly, it does not appear likely to me that the legislature would have even bothered to pass the act had it intended to accomplish nothing more than to allow an executor or administrator commissions on personal assets in the relatively few instances where he might receive actual physical possession thereof and thereafter distribute the same in kind.

Here, I think, the executor did exactly what he was required to do by law; he received control of the stock, though not the actual physical possession thereof, and he exercised that control diligently, judiciously and with expenditure of great time and effort to the advantage of the estate. It might not be amiss to point out that for the purpose of federal estate taxes an executor has several optional methods of valuing stock, Title 26, Section 2032, U. S,C. A. Which option the executor avails himself of to the best advantage of the estate is dependent to some extent upon the status of the particular estate and always upon the status of the market, but it is well known, at least in estate circles, that the exercise of the proper option by the executor frequently results in most substantial tax savings to the estate. These options are available whether stock is owned outright or held on margin. In a case such as this, had the executor not fully exercised his control over the stock, and had concerned himself solely with the net amount of money which might be received from the brokers after the liquidation of the accounts solely by the brokers, with primary emphasis upon the protection of their respective interests, at least a serious question could arise as to whether he was liable to the estate for not having diligently exercised his control in the manner most advantageous to the estate.

For all of the reasons herein set forth, I would reverse the judgment of the lower court and allow the executor com-

missions calculated on the basis of the appraised value of the stock. In the instant case the executor's commissions are substantial regardless of the basis upon which they are calculated, and the result reached by the majority may very well not be unjust to the appellants in regard to adequacy of compensation. We are, however, concerned only with the proper construction of the act and I am greatly concerned as to the effect of the decision upon the handling of other estates.

An additional reason impelling this dissent is the fact that a proposed probate code for the State of South Carolina is currently being prepared under the direction of the Judicial Council and will be shortly submitted to the legislature for its consideration. If this dissent serves no other useful purpose, it may at least serve the purpose of calling to the attention of both the Judicial Council and the Legislature the questions and problems involved in this case, to the end that they may take any action thereabout which may be deemed appropriate.

The foregoing portion of this dissent having been written prior to the preparation of the concurring opinion of Mr. Justice Brailsford, I now wish to point out, at least in part, wherein our views do not coincide. If the agreements referred to were complete contracts, which fixed all the rights, duties and obligations as between the customer and the respective brokers, then I might very well not disagree with his views thereabout.

Each of the agreements, however, is what is known and designated as a "customer's agreement"; they being identical with each other and apparently customary in connection with margin accounts. It is worthy of note that such agreements were signed only by the customer, William B. Ouzts, and not signed by the respective brokers, and nowhere therein are the duties, obligations or liabilities of the respective brokers set forth. Since the agreements are identical, I will now refer to them singly. The agreement recited that only

actual purchases or sales for the account of the customer were contemplated, and that all orders and transactions would be subject in all respects to the regulations and usages of the Security Exchange Commission, New York Stock Exchange, or other exchange or market where executed and of the clearing house thereof. The agreement then goes on to set forth authorizations to the broker by the customer to do various specific things, to facilitate the handling of the account of the customer by the broker in connection or conjunction with the accounts of various other customers of the broker. The agreement does give to the broker protection against loss by the broker, in that the broker, among other things, is given the right to liquidate the account upon the occurrence of a number of different eventualities, one of which is the death of the customer.

The basic and fundamental rights and liabilities of both the customer and the broker, however, I think were fixed by applicable regulations, usages and general principles of law governing the nature of the relationship of the parties and the transactions being handled. Of course, the customer could by agreement waive his basic legal rights, but here I do not think that the customer's agreement, fairly construed, waived any of Ouzts' fundamental legal or property rights.

As a matter of law, the brokers here occupied the dual role of fiduciaries and pledgees. 12 Am. Jur. (2d), Brokers, Sections 84 and 115. By a pledge contract, the pledgor does not part with his general right of property in the collateral but such remains in him and only a special property right vests in the pledgee, and this is still held to be true even where the legal title to the property, here the stock certificates, is vested in the pledgee. See 41 Am. Jur. 603, Pledge and Collateral Security, Section 27.

Under these applicable rules of law it seems to me clear that the general right of property in the collateral was vested in William Ouzts during his lifetime and not waived by any provision in the customer's agreement. Upon his death such

general right of property in the collateral passed to his personal representative, and I think it clearly follows that the executor succeeded to these property rights; had the same control with respect thereto that William Ouzts had, and became responsible therefor. Here the brokers in each instance recognized the lawful property rights of William Ouzts in and to the various shares of stock purchased by them for the account of William Ouzts, which property rights passed to the executor, and dealt with the executor accordingly.